UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
IN RE SEPTEMBER 11 LITIGATION           :
                                        :   **OPINION AND ORDER DENYING**
                                        :   **MOTIONS TO DISMISS ALL CLAIMS**
                                        :   **OF SUBROGATED INSURERS**
                                        :
                                        :   21 MC 101 (AKH)
                                        :
                                        :   04 Civ. 7272 (AKH)
                                        :
-------------------------------------------------------- x
ALVIN K. HELLERSTEIN, U.S.D.J.:

        New York State law reduces the recovery of a tort claimant by the amount of collateral source payments that he has received. For example, if a tort claimant was insured for the risk upon which he sues, his insurance recovery is deducted from any judgment that he recovers from the tortfeasor. See N.Y. C.P.L.R. § 4545. I am now asked to decide whether, once an insurer has paid its insured party for a loss, § 4545 deprives that insurer of its subrogation right to proceed directly against the tortfeasor to recoup the amount of that payment. For the reasons discussed in this opinion and in the recent decision of the New York Court of Appeals in Fasso v. Doerr, 12 N.Y.3d 80 (2009), I hold that plaintiffs' insurers retain subrogation rights despite § 4545, and may advance these rights against the alleged tortfeasors in this litigation.

        There are three motions before me, each seeking summary judgment dismissing subrogation claims of insurers of property destroyed by the terrorist-related aircraft crashes into Towers One and Two of the World Trade Center on September 11, 2001. Plaintiffs affiliated with the developer Larry Silverstein, long-term lessee of the World Trade Center (hereafter, "WTCP Plaintiffs"), move to bar the claims of the insurers that indemnified and paid their losses.

1

The Aviation Defendants—airlines, airport security companies, and other such defendants[1] sued by both the WTCP Plaintiffs and their insurers—move for the same relief, seeking to reduce the number of claims against them and avoid duplicate recoveries for similar losses.[2]  The third motion relates to Tower Seven and the claims of the Consolidated Edison Company of New York, Inc. ("Con Edison"), the lessee of the power substation beneath and around Tower Seven that was destroyed on the day of the attacks.  Certain defendants in the Tower Seven action—including the Silverstein companies that had leased the office tower and some of its tenants—move to bar the claims of the insurers that indemnified and paid Con Edison's loss, also seeking to reduce the number of claims against them and avoid duplicate recoveries.  All of these property damage cases have been collected for coordinated pre-trial proceedings in 21 MC 101, including the Tower Seven action, 04 Civ. 7272.[3]

An important motivation for the WTCP Plaintiffs' motion arises from a limitation of liability imposed by the governing law, the Air Transportation Safety and System Stabilization Act of 2001 ("ATSSSA"), Pub. L. No. 107-42, 115 Stat. 230 (2001), at 49 U.S.C. § 40101.  That statute provides that the liability of the Aviation Defendants for all claims arising from the attacks of September 11, 2001 may not exceed the liability insurance coverage of those defendants.  ATSSSA § 408(a)(1).  The prospect of an incomplete recovery led the WTCP Plaintiffs to file this motion on February 12, 2009.  The Aviation Defendants filed their motion for the same relief on March 13, 2009.  Some defendants in the Tower Seven litigation (hereafter, "7WTC Defendants") filed their motion on March 30, 2009.

---

[1] I listed these defendants in In re Sept. 11 Litig., 621 F.3d 131, 140 n.1 (S.D.N.Y. 2009).
[2] Nothing in this opinion authorizes such duplicate recoveries.  A single loss may be divided into the separate claims of an insured plaintiff and its subrogated insurer, but the tortfeasor remains liable only for the single loss.  See Winkelmann v. Excelsior Ins. Co., 85 N.Y.2d 577, 582 (1995).
[3] Full descriptions of these cases may be found in my prior decisions.  See, e.g., In re Sept. 11 Litig., 590 F. Supp. 2d 535 (S.D.N.Y. 2008), for the lawsuits involving the WTCP Plaintiffs and their subrogated insurers, and In re Sept. 11 Prop. Damage & Bus. Loss Litig., 468 F. Supp. 2d 508 (S.D.N.Y. 2006), and In re Sept. 11 Litig., 2009 U.S. Dist. LEXIS 64688 (S.D.N.Y. 2009), for the lawsuits involving Con Edison and its subrogated insurers.

## I. Background

The Port Authority is a nonprofit agency created to promote the commercial interests of New York and New Jersey. In the late 1990s, the Port Authority began a process to privatize the buildings of the World Trade Center complex in lower Manhattan, which it had owned since they were built in the late 1960s and early 1970s. On July 16, 2001, it leased four buildings—1, 2, 4, and 5 World Trade Center—for ninety-nine years to companies owned by developer Larry Silverstein. The Silverstein companies, required by the leases to repair or rebuild the premises to the extent "feasible, prudent and commercially reasonable," insured the buildings for $3.5468 billion per occurrence through over twenty property insurers.[4]

In 1968, the Port Authority secured electrical power for the World Trade Center complex by contracting with Con Edison, and building and leasing to Con Edison an electrical power substation just north of the site. Con Edison undertook to operate the substation to supply power to the World Trade Center complex and to neighboring areas of lower Manhattan.

In the 1980s, the Port Authority contracted with companies affiliated with Larry Silverstein to build an office tower, known as 7 World Trade Center ("7WTC"), above the substation. The Port Authority owned the tower and leased it to the Silverstein companies, which in turn leased substantial office space in the tower to Salomon Brothers, the predecessor of Citigroup, Inc. Con Edison continued to operate the substation pursuant to its lease agreement with the Port Authority, provisions of which required Con Edison to repair or rebuild the substation if it were ever damaged or destroyed.[5]

As the workday began on September 11, 2001, terrorists crashed fuel-laden jumbo jets, filled with passengers, into each of the Twin Towers, first into Tower One, and, seventeen

---

[4] I described these events in more detail in In re Sept. 11 Litig., 590 F. Supp. 2d at 536-39.
[5] See In re Sept. 11 Litig., 2009 U.S. Dist. LEXIS 64688, for a fuller description of the circumstances of the lease.

minutes later, into Tower Two.  The towers became infernos, trapping hundreds within, streaming fire and debris over the entire World Trade Center complex, and enveloping lower Manhattan in smoke and choking fumes.  After burning for hours, 7WTC collapsed in the late afternoon, destroying Con Edison's substation beneath it.  Other World Trade Center buildings and surrounding buildings were damaged beyond repair, and demolished.

By the ATSSSA, enacted and signed eleven days after the attacks, Congress provided for the litigation that inevitably arose.  The statute gave this Court "original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001."  ATSSSA § 408(b)(3).  In addition, it limited the liability of any "air carrier, aircraft manufacturer, airport sponsor, or person with a property interest in the World Trade Center" to the amount of "liability insurance coverage maintained by that air carrier, aircraft manufacturer, airport sponsor, or person."  Id. § 408(a)(1).  Congress intended this provision "to preserve the United States' aviation industry, to protect the airlines and aircraft manufacturers from the potential of crushing liability, and to ensure that plaintiffs would be able to recover damages without bankrupting the airlines."  In re Sept. 11 Litig., 590 F. Supp. 2d 535, 545 (S.D.N.Y. 2008).  The liability insurance coverage of the Aviation Defendants falls well short of the total damages sought by all claims asserted against them.  See In re Sept. 11 Litig., 567 F. Supp. 2d 611, 613 (S.D.N.Y. 2008).

The Silverstein companies (the WTCP Plaintiffs), having leased the World Trade Center buildings only a few months before September 11, 2001, asserted negligence claims of $12.3 billion ($8.4 billion to replace the buildings, and $3.9 billion to replace lost rental income) against the array of Aviation Defendants.  The WTCP Plaintiffs received $4.1 billion in

4

insurance proceeds from their property insurers. These insurers, having become subrogated to the claims of their insured parties, then filed their own tort claims against the Aviation Defendants to recover the amount of their insurance payments to the WTCP Plaintiffs.

Con Edison asserted negligence claims against various entities involved in the construction and operation of, and use of space within, 7WTC, as well as against many of the Aviation Defendants. Con Edison received at least $41 million in insurance proceeds from its property insurers. These insurers then joined the action against the 7WTC Defendants to recover the amount that they had paid to Con Edison.[6]

The dual claims of insured and insurers against the same set of defendants gave rise to recent motion practice between the Aviation Defendants and the WTCP Plaintiffs. The Aviation Defendants moved to limit the WTCP Plaintiffs' claims to the fair market value of their leaseholds (as measured by what they paid on April 26, 2001, $2.8 billion), rather than their replacement cost and lost income claims of $12.3 billion, and further moved to eliminate the claims altogether because the WTCP Plaintiffs' insurance recovery of $4.1 million exceeds that fair market value, and the collateral source rule of N.Y. C.P.L.R. § 4545(c) reduces any tort recovery up to $2.8 billion by the larger insurance recovery. On December 10, 2008, I held that the WTCP Plaintiffs could recover only the fair market value of their leaseholds as of September 11, 2001, the date that their value was destroyed. In re Sept. 11 Litig., 590 F. Supp. 2d at 546-47. After further proceedings, I fixed that value as $2.8 billion, for the WTCP Plaintiffs had not shown that the value as of September 11, 2001 differed from the result of the competitive bidding reflected in the April 26, 2001 contract by which they acquired the ninety-nine-year

---

[6] Two actions relate to 7 World Trade Center, the first against the Port Authority (02 Civ. 7188), and the second against the other 7WTC Defendants (04 Civ. 7272). I recently granted partial judgment to the plaintiffs, and dismissed the remainder of the Second Amended Complaint, in the first of these actions. See In re Sept. 11 Litig., 2009 U.S. Dist. LEXIS 64688. Discovery is proceeding in the second action.

tenancy from the Port Authority.

I denied the motion, without prejudice, as to applying the collateral source rule, observing that "[m]uch more has to be known about the statute, its development, the developing case law, and the factual questions previously stated," including whether the statute, in reducing the recoveries of plaintiffs that receive insurance payments, also affects the rights of insurers that bring subrogation claims alongside the claims of their insureds. Id. at 548. Since the amount that the WTCP Plaintiffs have received from their property insurers, $4.1 billion, exceeds the damages potentially available to them, $2.8 billion, the Aviation Defendants have filed a renewed motion seeking to apply the collateral source rule of § 4545(c) to the claims of the WTCP Plaintiffs.

The present motions, filed first by the WTCP Plaintiffs and then by the Aviation Defendants and the 7WTC Defendants, invoke § 4545(c) in a different respect. They seek to bar all claims by the subrogated insurers of both the WTCP Plaintiffs and Con Edison, arguing that the collateral source rule, in offsetting damage recoveries of plaintiffs by the amount of insurance proceeds received, must also disallow plaintiffs' subrogated insurers to recover for themselves the amount of insurance proceeds paid. Having been briefed fully by the parties, and having had the opportunity to study the issue, I am now prepared to issue my rulings.

## II. Summary Judgment Standard

To succeed on a motion for summary judgment, the moving party must show that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must "resolve all ambiguities, and credit all

factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (citations omitted). However, "[m]ere speculation and conjecture is insufficient to preclude the granting of the motion." Harlen Assocs. v. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

### III.  Analysis

I first address whether the WTCP Plaintiffs have standing to challenge the claims asserted by their subrogated insurers against the Aviation Defendants. I then address the merits of the three motions, examining the legislative changes affecting recoveries of insured tort claimants, the New York law of subrogation rights, the relationships among insurers, insureds, and tortfeasors, and the relevant case law.

### A.  Standing

The motions of the Aviation Defendants and the 7WTC Defendants seek to dismiss the claims of plaintiffs who have sued them in their respective actions, arguing that the claims are barred by § 4545(c). Clearly, these moving parties have standing to move for summary judgment dismissing claims against them.

The WTCP Plaintiffs, however, have not been sued by their insurers. The two sets of parties are both plaintiffs, suing common defendants in separate actions, for causing a loss that they share, at least to some degree. Rather, the standing of the WTCP Plaintiffs arises from the ATSSSA and its provision limiting the liability of the Aviation Defendants to the amount of their liability insurance coverage. § 408(a)(1). The WTCP Plaintiffs have standing because their potential recovery may be affected by the claims of other plaintiffs, their subrogated insurers. The WTCP Plaintiffs gain a better chance of recovery if they succeed in eliminating these other claims, which, they argue, are insufficient because barred by New York law.

7

There is also a notion that a plaintiff in one lawsuit should not file a motion in another lawsuit without having been allowed to intervene. In order not to be delayed by procedural technicalities that easily can be resolved, I treat the WTCP Plaintiffs' motion as a motion to intervene in the actions of their subrogated insurers, pursuant to Fed. R. Civ. P. 24, and grant the intervention. Because the two sets of plaintiffs are competing claimants to a limited fund, each has sufficient interest and standing to move against the other, and may suffer prejudice if intervention is denied. See Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 146 (1967) ("[W]hen a number of persons possess claims to a fund which are or may be mutually exclusive, intervention is allowed a claimant.").

### B.  New York Law

The ATSSSA provides that the substantive law governing suits brought under the statute shall be that of the state in which the relevant crash occurred, unless preempted by or inconsistent with federal law. § 408(b)(2). All sides agree that the New York law of subrogation rights applies to these motions, that N.Y. C.P.L.R. § 4545(c) is the statute at issue, and that no question of federal preemption is presented. See Turnbull v. USAir, Inc., 133 F.3d 184, 186-89 (2d Cir. 1998) (treating § 4545 as creating substantive, not procedural, law).

Having examined the common law of subrogation rights in New York, the impact of § 4545 on that common law regime, and the significant decisions of the New York courts, I conclude that New York law allows the claims of the subrogated property insurers of both the WTCP Plaintiffs and Con Edison to proceed.

### 1. Subrogation Rights and the Collateral Source Rule

Subrogation is "[t]he principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a

8

third party with respect to any loss covered by the policy." Black's Law Dictionary 1564 (9th ed. 2009); see Winkelmann v. Excelsior Ins. Co., 85 N.Y.2d 577, 581 (1995). "[T]he insurer, upon payment, is 'substituted' for and 'stands in the shoes' of the insured with respect to all rights, both substantive and procedural, that the insured possesses." Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 5.06(c), at 370 (14th ed. 2008). In addition, the insurer is subject to all defenses that would apply against its insured. See Allstate Ins. Co. v. Stein, 1 N.Y.3d 416, 421 (2004). "[S]ubrogation is based upon principles of equity and natural justice," for, as the Court of Appeals has held, "an insurer who has been compelled by his contract to pay to or in behalf of the insured claims for damages ought to be reimbursed by the party whose fault has caused such damages." Ocean Accident & Guar. Corp. v. Hooker Electro-Chemical Co., 240 N.Y. 37, 47 (1925); see Fed. Ins. Co. v. Arthur Andersen & Co., 75 N.Y.2d 366, 372 (1990). "The doctrine is liberally applied for the protection of those who are its natural beneficiaries—insurers that have been compelled by contract to pay the loss caused by the negligence of another." Winkelmann, 85 N.Y.2d at 581. The insurer is known as the "subrogee," and is said to be "subrogated" to the rights of its insured, the "subrogor."[7]

   At common law, an insured plaintiff could recover against a tortfeasor regardless of whether it had received insurance proceeds. "[T]he 'collateral source rule' precluded the reduction of a personal injury award by the amount of compensation a plaintiff received from a source other than the tortfeasor." Iazzetti v. City of New York, 94 N.Y.2d 183, 187 (1999). This rule was "based on the premise that a negligent defendant should not, in fairness, be permitted to reduce its liability by the proceeds of insurance or some other source to which that defendant has not contributed." Oden v. Chemung County Indus. Dev. Agency, 87 N.Y.2d 81, 85 (1995).

---

[7] There are two types of subrogation, contractual and equitable. The distinction is not relevant for purposes of the movants' argument, because the rights of a subrogee are those of its subrogor, whether granted in equity or by contract. See, e.g., Costello v. Geiser, 85 N.Y.2d 103, 109 (1995).

9

Thus, a plaintiff could recover twice for the same injury, once from the tortfeasor, and again from its own insurer, having "paid premiums for the extra protection." Nossoughi v. Federated Dep't Stores, 669 N.Y.S.2d 479, 482 (Sup. Ct. N.Y. County 1998).

However, the principles of equitable subrogation also allow an insurer that has paid a claim to proceed, in subrogation, against its own insured. Accordingly, "if an injured party receives monies from the tortfeasor attributable to expenses that were paid by its insurer, the insurer may recoup its disbursements from its insured; but when the wrongdoer does not pay damages for an insured's medical expenses, generally the insurer, as subrogee, has been allowed to seek recovery directly from the tortfeasor." Fasso v. Doerr, 12 N.Y.3d 80, 87 (2009) (citing Teichman v. Cmty. Hosp. of W. Suffolk, 87 N.Y.2d 514, 521-23 (1996)). However, "an insurer has no right of subrogation against its insured when the insured's actual loss exceeds the amount it has recovered from both the insurer and the wrongdoer." Winkelmann, 85 N.Y.2d at 581. If the insured's loss exceeds the proceeds of its insurance, both it and its subrogated insurer may bring suit against the tortfeasor, as "[t]he claims of the insurer for amounts paid by it and the insured's claim for uninsured losses are divisible and independent, and '[p]ermitting the insurer to sue … as equitable subrogee does not affect the insured's right to sue for the amount of the loss remaining unreimbursed.'" Id. (quoting Fed. Ins. Co., 75 N.Y.2d at 374)).

In the 1970s, the New York legislature began to implement tort reforms that basically eliminated the common law collateral source rule. In 1975, it amended N.Y. C.P.L.R. § 4010 to allow juries in medical malpractice cases, when awarding economic damages, to consider evidence that the plaintiff had received collateral source payments. See Firmes v. Chase Manhattan Auto. Fin. Corp., 852 N.Y.S.2d 148, 157 (2d Dep't 2008) (citing Oden, 87 N.Y.2d at 85). The common law rule, which had barred such evidence, "gave way to the need to

10

address the 'crisis' that had developed in the medical malpractice insurance industry," in which doctors and hospitals appeared unable to afford the rising cost of such insurance. Id. In 1981, the legislature "solidified and strengthened" its encroachment on the common law by requiring, rather than merely allowing, the reduction of damage awards based on collateral evidence, and by directing the court, not the jury, to make that reduction. Oden, 87 N.Y.2d at 85.

Another set of tort reforms followed in the mid-1980s. In 1984, the legislature replaced § 4010 with § 4545(a), with no substantive changes. At the same time, it created § 4545(b), which requires offsets from personal injury and wrongful death awards obtained by public employees if the plaintiff was injured on the job and received a collateral payment from its employer. Id. In 1985, the legislature expanded § 4545(a) to require reductions in dental malpractice cases, as well as reductions, in both medical and dental malpractice cases, to account for any future collateral source payment that a plaintiff would receive "with reasonable certainty." See id. at 85-86; see also Bryant v. N.Y.C. Health & Hosps. Corp., 93 N.Y.2d 592, 605-06 (1999). Finally, in 1986, the legislature enacted § 4545(c), which extended the abrogation of the common law rule to all personal injury, property damage, and wrongful death actions. It provides:

> In any action brought to recover damages for personal injury, injury to property or wrongful death, where the plaintiff seeks to recover for the cost of medical care, dental care, custodial care or rehabilitation services, loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source such as insurance (except for life insurance) . . . . If the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any collateral source, it shall reduce the amount of the award by such finding, minus an amount equal to the premiums paid by the plaintiff for such benefits for the two-year period immediately preceding the accrual of such action and minus an amount equal to

11

>> the projected future cost to the plaintiff of maintaining such benefits.

N.Y. C.P.L.R. § 4545(c). In the context of the property damage litigation before me, § 4545(c) "allows the court to reduce a damage recovery for injury to property where a plaintiff, with reasonable certainty, can replace that property or be indemnified for past or future cost or expense with respect to that property from collateral source payments like insurance." In re Sept. 11 Litig., 590 F. Supp. 2d at 546.

In sum, in the 1970s and 1980s, the New York legislature used § 4545 and its predecessor to "trim back the collateral source rule and permit offsets against plaintiffs' recoveries." Bryant, 93 N.Y.2d at 605. "The result of the statute's evolution has been to control insurance costs by preventing, where applicable, the receipt of double recoveries by plaintiffs for economic loss." Firmes, 852 N.Y.S.2d at 158. An insured plaintiff may still recover in full for its injury, but it may no longer collect from the tortfeasor that part of its damages that its insurer had made, or will make, whole.

**2. The Present Dispute**

Section 4545 "abrogated almost entirely" the common law collateral source rule in New York, but without mentioning at all how that abrogation affects the insurers whose payments to reimburse a plaintiff were now to diminish the damages payable to that plaintiff. Insurers making such payments have long been protected by New York law, which puts them in the place of their insured—subrogated, that is, to the rights of the insured against the party whose tortious conduct led the insurer to pay the claim. See, e.g., Winkelmann, 85 N.Y.2d at 581; Conn. Fire Ins. Co. v. Erie Ry. Co., 73 N.Y. 399, 402 (1878) ("[I]f a loss is occasioned by the wrongful act of another the insurer is subrogated to the rights and remedies of the assured, and may maintain an action against the wrongdoer."). Typically, a subrogated insurer that pursues

such an action may exercise only those rights possessed by its insured (the subrogor), subject to all defenses which could be raised against the insured. <u>Allstate Ins. Co.</u>, 1 N.Y.3d at 421.

Section 4545 denies tort plaintiffs the right to recover damages that duplicate insurance recoveries. <u>See, e.g.</u>, <u>Wooten v. State of New York</u>, 753 N.Y.S.2d 266, 269-70 (4th Dep't 2002). If a subrogated insurer "stands in the shoes" of its subrogor, the moving parties argue, and has only the "derivative and limited rights of the insured," <u>Winkelmann</u>, 85 N.Y.2d at 581, the insurer should not be able to recover more from a tortfeasor than its insured could recover. Pouncing on an uncertainty which they ascribe to the case law applying the statute, the moving parties argue that § 4545, which abrogated the common law collateral source rule, must also have abrogated insurers' right of subrogation. However, as discussed below, the moving parties present a faulty analysis and a faulty reading of the New York case law.

A subrogee assumes the rights of the subrogor as of the moment at which it, the insurer, makes the insurance payment to its insured. <u>See</u> <u>Allstate Ins. Co.</u>, 1 N.Y.3d at 421 ("[T]he subrogee possesses only such rights as the subrogor possessed, with no enlargement or diminution."); <u>Fed. Ins. Co.</u>, 75 N.Y.2d at 372 ("The rights of an insurer as equitable subrogee against a third party are derivative and limited to such rights as the insured 'would have had against such third party for its default or wrongdoing.'" (quoting <u>Ocean Accident & Guar. Corp.</u>, 240 N.Y. at 47)). At that moment, the insured has not yet received the insurance payment, and so is not yet subject to the § 4545 setoff defense, for that defense follows and arises from the payment, as it works to avoid a duplicate recovery by the insured. Hence, the insurer takes its subrogation rights as they existed at the time of, and not after, the collateral source payment. Section 4545 prevents double recoveries; it was not intended to deprive insurers of their basic subrogation rights, provided by equity for fairness, and also by law through the assignment

13

clauses typical of insurance contracts, which require the insured to assign its rights against the tortfeasor in consideration for receiving the insurance proceeds that allay its injury. Certainly, § 4545 was not intended to create a windfall for the tortfeasor, granting it the benefit of the injured party's insurance, for which it did not pay, as a reward, in effect, for committing a tort and injuring another.

The New York courts have confirmed that the purpose of § 4545 is to prevent plaintiffs from enjoying duplicate recoveries from both their insurers and tortfeasors, and not to give unfair windfalls to tortfeasors and their liability insurers. See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc., 3 N.Y.3d 200, 208 (2004) ("[Section 4545] was enacted in 1986 in order to prevent duplicative recoveries for, among other things, costs of medical care."); Bryant, 93 N.Y.2d at 607 ("CPLR 4545 was intended to eliminate double recoveries, not provide defendants and their insurers with an 'undeserved windfall.'" (citation omitted)); Kihl v. Pfeffer, 848 N.Y.S.2d 200, 206 (2d Dep't 2007) ("[T]he purpose of CPLR 4545 . . . is to eliminate double recoveries, not to provide defendants and their insurers with an undeserved windfall relieving them of the obligation to pay damages awards for economic loss."); Omiatek v. Marine Midland Bank, N.A., 781 N.Y.S.2d 389, 391 (4th Dep't 2004) ("[T]he purpose of section 4545 is to prevent plaintiffs from receiving 'windfalls and double recoveries for the same loss.'" (quoting Fisher v. Qualico Contr. Corp., 98 N.Y.2d 534, 537 (2002)); Kelly v. Seager, 558 N.Y.S.2d 403, 403 (4th Dep't 1990) ("The purpose of the statutory collateral source rule is to prevent multiple recoveries for the same loss by an injured party."); Nossoughi, 669 N.Y.S.2d at 482 ("[T]he princip[al] purpose of CPLR 4545 was to modify the common law collateral source rule as to prohibit a double recovery."); cf. Teichman, 87 N.Y.2d at 523 ("Allowing [plaintiff's insurer] to seek a refund of any medical expense payments included in the settlement both

14

prevents a potential double recovery by plaintiffs and assures that tortfeasors, not ratepayers, will ultimately bear the expense.").[8]

The New York Court of Appeals first discussed the issue in Fisher v. Qualico Contr. Corp., 98 N.Y.2d 534 (2002). In that case, a homeowner whose property had been damaged recovered the diminished fair market value of his property from the tortfeasor. The homeowner also had recovered the replacement value of the property from his insurer. The Court of Appeals held that there was sufficient correspondence between the homeowner's insurance recovery and his damage recovery to require that the former be subtracted from the latter, pursuant to § 4545. The court observed that its holding would not "create a windfall for negligent defendants by allowing them to escape liability where a homeowner has insured against the loss of real property," because "a defendant still may be held responsible in subrogation to the homeowner's insurer." Id. at 540.

In Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc., 3 N.Y.3d 200 (2004), the Court of Appeals, ruling on certified questions from the Second Circuit, held that Empire, the plaintiff insurer, could not bring derivative claims against the tobacco companies based on injuries to its plan members under N.Y. Gen. Bus. Law § 349, because that consumer protection law grants standing only to the party actually injured. The court noted that its holding would not "immunize the tobacco companies from liability," because § 4545, which "was enacted in 1986 in order to prevent duplicate recoveries," "does not alter Empire's traditional remedy because 'a defendant still may be held responsible in subrogation.'" Id. at 208 (quoting

---

[8] The moving parties argue that the legislative history of § 4545 shows that the legislature was focused on the need to relieve businesses and medical professionals from crushing liability insurance rates, and further argue that preventing double recoveries, without abolishing subrogation rights, would not have been sufficient to fix the liability insurance crisis. The moving parties concede, however, that neither the statute nor the legislative history, fairly read, makes reference to any impact on subrogation rights. In light of the extensive analysis by the New York courts of this question, there is no need for further discussion by me.

15

Fisher, 98 N.Y.2d at 540)).  Thus, in holding that "[i]nsurers cannot sidestep their traditional remedy of subrogation" by suing derivatively under Gen. Bus. Law § 349, the Court of Appeals affirmed the continued viability of that traditional remedy, notwithstanding § 4545.  Id. at 208-09.

Most recently, in Fasso v. Doerr, 12 N.Y.3d 80 (2009), the Court of Appeals considered whether, by reaching a settlement, the plaintiff and defendant in a tort action could extinguish the subrogation rights of the plaintiff's insurer, which had intervened in the case.  A plaintiff may not thwart its insurer's subrogation claims, the court held, by settling its own claims for less than its total damages.  Id. at 87-89.  Thus, the Court of Appeals held that the plaintiff's effort to release his insurer's subrogation rights was invalid, and that the subrogation claims remained viable.  Id.  The court then noted the "uncertainty regarding how and when health insurers should assert their subrogated claims" and the "competing policy concerns" involved, and invited the legislature to address the problem.  In this context, the court observed that, in enacting § 4545, "the Legislature did not address the procedures and means of recovery for the equitable subrogation rights of insurers," and further observed that "nothing in the language or legislative history of CPLR 4545 indicates that the Legislature intended to alter the established rules of equitable subrogation."  Id. at 90 (citations omitted).  This plain language demonstrates that § 4545 does not affect the equitable subrogation rights of plaintiff's insurers, as does the context of the discussion, which concerned "how and when" subrogated insurers may assert their claims, not whether they may do so.

The Second Department, before the three New York Court of Appeals rulings discussed above, had attributed a different legislative intent to § 4545.  The Second Department posited that the legislature intended to benefit liability insurers by reducing their tort payouts as

16

against all plaintiffs, whether subrogors (injured plaintiffs) or subrogees (health or property insurers). See Humbach v. Goldstein, 653 N.Y.S.2d 950, 952 (2d Dep't 1997) ("The purpose of CPLR 4545 is not only to prevent double recovery by plaintiffs, but also to keep down the liability insurance costs of policyholders."); see also Oxford Health Plans, Inc. v. Augustino Deli & Caterers, Inc., 724 N.Y.S.2d 338, 338 (2d Dep't 2001). Also before the three rulings of the Court of Appeals, the Third Department had cited Humbach approvingly in Berry v. St. Peter's Hosp. of the City of Albany, 678 N.Y.S.2d 674, 678 n.6 (3d Dep't 1998) ("[T]he fact that [§ 4545], which was enacted to bar double recoveries to victims, in effect shifts the costs of medical expenses from liability carriers to health insurers, is a matter best left to the Legislature."). However, the Second Department did not explain why, in the absence of explicit statutory provisions or legislative history concerning subrogation, the statute should be interpreted to give advantage to tortfeasors and their liability insurers at the expense of medical and property damage insurers, or why insurers who actually pay claims should be required to lose their subrogation rights to benefit tortfeasors and their liability carriers.[9]

The Fourth Department did not agree with the Second Department, and held that § 4545 does not restrict the subrogation rights of plaintiffs' insurers, reasoning that "'[t]he purpose of the statutory collateral source rule is to prevent multiple recoveries for the same loss

---

[9] David D. Siegel, in an essay on § 4545, aptly describes the clash of the relative privileges of the tortfeasor's liability insurer and the plaintiff's health insurer:

> [Section 4545] purports to let the liability insurer deduct from the verdict any items of damages [that the plaintiff] has received from a "collateral source" (like health insurance). But those are the very items, contradictorily, that the health insurer wants back. CPLR 4545 sets the stage for a fight between health and liability insurers, in other words . . . . It furnishes the liability insurer the sword of the collateral source reduction while the health insurer stands by with the sword of subrogation, and there they stand with crossed swords—the director having left the set with no further instructions.

David D. Siegel, ed., Settlement Between Injured Plaintiff and Tortfeasor Defendant Can't Wipe Out Subrogation Claim of Health Insurer, New York State Law Digest No. 591 (March 2009), at 2.

by an injured party . . . [, and t]hat purpose would not be served by its application to subrogation claims.'" Kaczmarski v. Suddaby, 779 N.Y.S.2d 394, 394 (4th Dep't 2004) (quoting Kelly, 558 N.Y.S.2d at 403)); see Omiatek, 781 N.Y.S.2d at 391 ("[A]lthough CPLR 4545(c) requires a reduction of the damages for medical expenses with respect to plaintiff, defendant still may be held responsible in subrogation to . . . [plaintiff's health care] insurer." (quotation marks omitted)).  The New York County Supreme Court addressed the question at length and held to the same effect, that § 4545 does not affect subrogation rights:

> Since the princip[al] purpose of CPLR 4545 was to modify the common-law collateral source rule so as to prohibit a double recovery, permitting the health insurer to recover its out-of-pocket expenses from the tortfeasor's insurer does not violate such intent as the claims of the subrogee are separate and distinct from those of the subrogor, being "divisible and independent." Winkelmann, 85 N.Y.2d at 582.  While the intent of the Legislature in enacting the several provisions of CPLR 4545 (first in malpractice cases and then in other tort litigation) was also to reduce the costs of liability insurance, it cannot be said that its intent was to do so at the expense of health insurers.  This view was implicitly expressed by the Court of Appeals in Teichman where it authorized intervention by MetLife so that "tortfeasors, not ratepayers, will ultimately bear the expense" of medical costs.  87 N.Y.2d at 523.

Nossoughi, 669 N.Y.S.2d at 482; see also Principe v. City of New York, 813 N.Y.S.2d 872, 873-74 (Sup. Ct. Richmond County 2006) (explaining that, in each of its decisions in Teichman, Fisher, and Blue Cross, the Court of Appeals contemplated subrogation claims surviving § 4545, and rejecting Humbach, 653 N.Y.S.2d at 952, as inconsistent with these cases); Gramieri v. City of New York, 806 N.Y.S.2d 444, 444 n.4 (Sup. Ct. N.Y. County 2005).

United States Senior District Judge Jack B. Weinstein held similarly in Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc., 113 F. Supp. 2d 345 (E.D.N.Y. 2000), and explicitly rejected the view expressed by the Second Department.  In Blue Cross, the plaintiff health insurers argued that the defendant tobacco companies had fraudulently induced

18

plan members to begin and to continue to smoke, causing the plaintiff insurers to incur the costs of treating smoking-related illnesses.  The tobacco companies, relying on Humbach, 653 N.Y.S.2d at 952, sought to dismiss the claims of plaintiff Empire on the ground that, "because the insured could not recover health care expenditures paid on their behalf by Empire, Empire is itself in turn foreclosed from recovering, since . . . recovery under subrogation cannot be any more than the insureds' rights of recovery."  Blue Cross, 113 F. Supp. 2d at 380.  The court found the decision of the Second Department in Humbach to be "inconsistent with the general body of law on equitable subrogation," as expressed in other decisions of the New York courts, and declined to hold that § 4545 barred the insurer's subrogation claims.  Id.

       Whatever the view of the Departments, the rule of law, now established by three decisions of New York's highest court, is that § 4545 does not affect the subrogation rights of plaintiffs' insurers.  The principle of subrogation is so embedded in the common law, and would be so radically affected, that a very clear legislative intent to disrupt it is required.  As the Court of Appeals has held, analyzing the statute in a different context, "CPLR 4545(c) is a statute enacted in derogation of the common law and, as such, is to be strictly construed . . . in the narrowest sense that its words and underlying purposes permit, since the rules of the common law must be held no further abrogated than the clear import of the language used in the statute absolutely requires."  Oden, 87 N.Y.2d at 87 (quotation marks omitted); see Blue Cross, 113 F. Supp. 2d at 380.  The statute contains absolutely no language that effects the disruption for which the moving parties argue.  It eliminated a well-established feature of the common law, the collateral source rule, with clarity.  In the absence of any similar clarity, and in light of the consistent holdings of the Court of Appeals, I hold that the statute did not also eliminate the subrogation rights of plaintiffs' insurers.

## IV. Conclusion

For the reasons discussed in this opinion, I hold that § 4545 did not affect insurers' subrogation rights. In terms of the motions before me, although § 4545 may bar the WTCP Plaintiffs and Con Edison from recovering damages for which they have been compensated by their insurers, it does not bar their insurers, who have been "compelled by contract to pay the loss caused by the negligence of another," Winkelmann, 85 N.Y.2d at 581, from asserting subrogation rights against the alleged tortfeasors.

The Clerk shall mark the motions (Docs. #724 & #756 in 21 MC 101, and #359 in 04 Civ. 7272) as terminated.

SO ORDERED.

Dated:   August 13, 2009
         New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge