

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/23/2011

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

IN RE SEPTEMBER 11 LITIGATION      :

------------------------------------------------------- x

AEGIS INSURANCE SERVICES, INC.;      :
LIBERY INSURANCE UNDERWRITERS, INC.  :
(As to the First through Tenth Causes of Action);
NATIONAL UNION INSURANCE COMPANY   :
OF PITTSBURGH; NUCLEAR ELECTRIC     :
INSURANCE LIMITED; CERTAIN           :
UNDERWRITERS AT LLOYDS, (SYNDICATE  :
1225); a/s/o CONSOLIDATED EDISION    :
COMPANY OF NEW YORK, INC. and        :
CONSOILDATED EDISON COMPANY OF       :
NEW YORK, INC.,                       :

                          Plaintiffs,      :

         -against-      :

7 WORLD TRADE COMPANY, L.P.;         :
SILVERSTEIN PROPERTIES, INC.;        :
CITIGROUP, INC.; SALOMON SMITH       :
BARNEY HOLDINGS, INC.; SALOMON INC.;  :
SWANKE HAYDEN CONNELL ARCHITECTS;  :
AMBASSADOR CONSTRUCTION CO., INC.;   :
COSENTINI ASSOCIATES INC.; CANTOR    :
SEINUK GROUP, P.C.; OFFICE OF IRWIN G.  :
CANTOR, P.C.; H.O. PENN MACHINERY CO.,  :
INC.; KABACK ENTERPRISES; PREFERRED  :
UTILITIES MANUFACTURING CORP.;       :
ELECTRIC POWER SYSTEMS, INC.;        :
AMERICAN POWER TECHNOLOGIES, INC.;   :
G.C. ENGINEERING & ASSOCIATES, P.C.;  :
TISHMAN CONSTRUCTION CORPORATION;  :
FIRECOM INC.; GRACE CONSTRUCTION     :
PRODUCTS; FIBERLOCK TECHNOLOGIES,    :
INC.; EMERY ROTH & SON, P.C.; SYSKA &  :
HENNESSY ENGINEERS; SKIDMORE         :
OWINGS AND MERRILL, L.L.P.; FLACK &   :
KURTZ, INC.; ABCO PEERLESS SPRINKLER  :
CORPORATION; AMEC PLC FORMERLY       :
KNOWN AS MORSE DIESEL               :
INTERNATIONAL, INC.; CENTIFUGAL      :
ASSOCIATES, INC.; AMR CORPORATION;   :

**ORDER AND OPINION
GRANTING MOTIONS FOR
SUMMARY JUDGMENT BY
DEFENDANTS 7 WORLD
TRADE COMPANY AND
CITIGROUP**

21 MC 101 (AKH)

04 Civ. 7272

1

AMERICAN AIRLINES, INC.; UAL                    :
CORPORATION; UNITED AIRLINES, INC.;             :
COLGAN AIR, INC.; US AIRWAYS GROUP,             :
INC.; US AIRWAYS, INC.; HUNTLEIGH USA           :
CORPORATION; ICTS INTERNATIONAL NV;             :
GLOBE AVIATION SERVICES                          :
CORPORATION; BURNS INTERNATIONAL                 :
SECURITY SERVICES CORPORATION;                   :
PINKERTON'S INC.; SECURITAS AB;                  :
BOEING CO.,                                      :
                                                 :
                              Defendants.        :
----------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

At 5:21pm, on September 11, 2001, Tower 7 of the World Trade Center collapsed. Forty-seven stories came crumpling down, smashing the Consolidated Edison ("Con Ed") power station beneath. In this lawsuit, Con Edison filed claims against the builder and developer of the tower, the corporate nominee of Larry Silverstein, 7 World Trade Company, L.P. ("7WTCo."), and Citigroup, Inc., as successor-in-interest to Salomon, Inc., the primary tenant. Con Edison's claim is that Defendants' negligence proximately caused Con Edison's loss.

By this Order and Opinion, Con Edison's claims are dismissed, putting an end to this entire lawsuit. The duty upon which this claim, or any such claim, must be based, determined as at the time that 7 World Trade Center was designed and built and its leases executed, is too farfetched and tenuous to sustain a claim of negligence. Con Edison, in order to succeed, must overcome the improbability of a long chain of events, one acting upon another—having reasonably to foresee that terrorists with weapons could pass through airport screening; that such terrorists could accomplish a hijacking of a giant, fuel-laden aircraft; that the terrorists could turn that aircraft around and fly it low to the ground, at only several hundred feet of elevation, and crash it into a 110-story tower of the World Trade Center; that a team of other

terrorists also could pass through screening, hijack another aircraft and fly that aircraft into a second tower of the World Trade Center; that the damage from the impact and the intense fires caused by spilling aviation fuel would cause both towers to collapse; that debris from the collapse of the two towers could jump over a neighboring building and penetrate the façade of 7 World Trade Center, several hundreds of feet to the north; that intense, long-burning fires would result; that there would be no firemen to fight the fire and no water for firemen to use even if they were available to fight the fires in 7 World Trade Center; that there were no firemen available because 343 fireman had perished fighting the fires in Twin Towers, and the remaining firemen were totally engaged, physically and mentally, in searching through the debris of Towers One and Two for their lost comrades; and that there would be no water to fight the fires on 7 World Trade Center because the collapsing Twin Towers had crushed and destroyed the water system that could bring water to 7 World Trade Center; and that as a result of all these events, these links in an improbable chain, 7 World Trade Center collapsed, destroying the Con Edison substation below the collapsed debris.  I hold that the chain was much too improbable to be consistent with any duty, and I dismiss Con Edison's claims on that basis.

## I.  Facts

### a.  The Second Amended Complaint

Plaintiffs' Second Amended Complaint, filed July 11, 2008, alleged 17 claims against a large number of Defendants.  Only two Defendants remain, and Con Edison has alleged 4 claims against them, Citigroup and 7WTCo.

Counts 1 and 2 allege negligence against 7WTCo. in the design and construction of 7 World Trade Center, for permitting its commercial tenants to install diesel-fueled-backup generators in the building, and generally, Second Am. Compl. ¶¶ 148(a), (b), and, in Count 2, a

claim of negligence *per se*, for failing "to properly apply, interpret and enforce New York City and State fire and safety codes and regulations."[1] Id. ¶ 152.

Counts 3 and 4 allege a claim of negligence against Citigroup, for having designed and constructed its floors with an emergency generator system "that was unreasonably dangerous because it utilized an unreasonable amount of diesel fuel and because a breach of the system could provide a prolonged and substantial quantity of fuel to areas of fire close to critical structural supports in the building," Second Am. Compl. ¶¶ 158, 160(a)-(k), and, in Count Four, a claim of negligence *per se* similar to the claim against 7WTCo.

7WTCo. and Citigroup denied the allegations against them, and alleged as affirmative defenses that the events of September 11, 2001 were unforeseeable and intervening causes of the harm to the substation.

### b.    The World Trade Center Complex Before September 11, 2001

The World Trade Center, prior to September 11, 2001, formed a 16-acre development in downtown Manhattan.  The Twin Towers, 1 World Trade Center and 2 World Trade Center, each 110 stories high, rose from the southern and the western sides of the complex, along Liberty Street and West Street, respectively, with 3 World Trade Center, a much lower building framing the southwest corner, between them.  6 World Trade Center, a building of 8 stories, rose to the north of 2 World Trade Center on West Street and extended to Vesey Street.  Across Vesey Street and to the North, 7 World Trade Center stood 47 stories high.  4 World Trade Center and 5 World Trade Center, shorter buildings each 9 stories, filled out the complex, framing the northeast corner on Vesey and Church Streets, and the southeast corner on Church and Liberty Streets.  The map below shows the complex.

---

[1] Plaintiffs also had alleged a claim for breach of contract against 7WTCo., but withdrew it voluntarily after oral argument.  Stipulation of Dismissal with Prejudice and Without Costs or Attorneys' Fees as to Count XVII, Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 04 Civ. 7272 (Doc. No. 465) (S.D.N.Y. July 19, 2011).



### c.    The Con Edison Substation

In 1962, the Port Authority of New York and New Jersey, a bi-state government

agency formed in 1921 by compact between New York and New Jersey, was authorized by joint

legislation to acquire and develop the tract that became the World Trade Center.  In 1968, the

Port Authority granted a fifty-year lease to Con Edison on a rhombus-shaped portion of land just

to the north of the 16-acre tract, generally coinciding with the outline of what became 7 World

Trade Center, and contracted with Con Edison to construct a power station on the leasehold to

supply power to the entire complex.  See In re September 11 Litig., 640 F. Supp. 2d 323

(S.D.N.Y. 2009).  In Section 8(a) of the lease agreement, the Port Authority reserved the right to

"construct wholly or partially on, above or about the Substation Building additional stories,

structures, buildings or improvements of whatever design, size and purpose as the Port
Authority . . . determines."  Declaration of Jeffrey R. Wang ("Wang Decl."), Ex. B.

> **d.     7 World Trade Center**

In 1980, the Port Authority exercised its Section 8 rights under the Con
Edison/Port Authority lease, contracting with 7WTCo. to build 7 World Trade Center above the
substation.  7WTCo.'s agent, Silverstein Properties, contracted to design and build a forty-seven
story office tower, which the Port Authority was to own and lease back to 7WTCo. for 99 years.
Two features of the design and construction of 7 World Trade Center require special attention,
for they underpin Con Edison's theories, explained later in this Order and Opinion, of how the
building failed.

7 World Trade Center was designed as a trapezoid, tracking the shape of the plot
on which it was built, to maximize floor space on each floor.  To achieve this goal, the building
was designed to support the floor space with two sets of columns: a series of 24 "internal" load-
bearing columns, forming a rectangular core of the structure, and 19 "external" columns on the
perimeter of the trapezoid shape of the building.  Horizontal girders connected and stabilized the
columns.  The following diagram, presented by Con Edison during oral argument, shows the
layout of columns on a typical floor:

//

//

//

//

//

//

**North**



Based on structural drawings (Cantor 1985)

**South**

In the northeast corner of the structure (the top right corner of the diagram), the steel girders connecting column 79 to column 44 formed an oblique, rather than a right 90-degree angle. The trapezoidal configuration of the building, providing increased floor space along the building's eastern side, required such an obliquely situated configuration. The configuration also did not provide for girders tying column 79 to columns along the building's eastern perimeter.[2] There also was extra weight atop the northwest corner, in the form of a small office area on the roof, known as "the East Penthouse."

The building also was designed and constructed to transfer the weight of the building to bypass Con Edison's substation, so that it would rest on caissons below ground. Three massive two-story trusses were installed between the 5th and 7th stories, to carry and transfer the loads of the forty floors above them to those caissons.

According to a 1982 standard set by the American National Standards Institute ("ANSI"), buildings such as 7 World Trade Center, known as "Type 1" buildings, are meant to

---

[2] Con Edison Argued, as discussed later in this Order and Opinion, that the configuration weakened the stability of the structure in the northeast corner.

be designed to be capable of withstanding localized structural damage without suffering a global collapse.  Primarily, the structural elements are to be coated with a fire-resistant material that keeps them from being directly exposed to the fire for a discrete number of hours.  Such coating keeps the steel elements from expanding and breaking off their girders, and flammable elements from burning.  Such buildings also should have a system of connecting columns to beams in a way that distributes a certain amount of weight on to the columns themselves.  And such buildings should have sprinkler systems throughout, to provide comprehensive distribution of water to combat fires.  The standard also contemplates that buildings may rely on the fire department to quench fires.

### e.      Salomon Brothers and the Backup Generator

Construction of 7 World Trade Center finished in 1987.  On November 23, 1988, 7WTCo. signed a lease agreement with Salomon Brothers, the predecessor-in-interest to Citigroup.  Salomon Brothers leased the 28th through 47th floors of 7 World Trade Center, and all rentable space on the 1st through 5th floors.  The lease was to commence October 1, 1990, and to be preceded by agreed-upon alterations.  Salomon Brothers desired a trading floor that could run uninterrupted around the clock, and so obtained the right to install a backup generator on the 5th floor, together with any needed ancillary equipment.  To fuel the generator, Salomon Brothers was authorized to install two diesel tanks with a capacity to store 6,000 gallons of fuel each under 7 World Trade Center's truck bays, with pressurized fuel lines connecting the tanks to the generator above, on the 5th floor.

### f.      The History of Terrorist Attacks Through September 11, 2001

There has been a long history of deadly terrorist attacks against Americans and American institutions, and frequently involving passenger-laden aircraft.  See, e.g., United States

8

v. Yousef, 327 F.3d 56 (2d Cir. 2003); United States v. Rahman, 189 F.3d 88 (2d Cir. 1999); see also Second Declaration of Jemi M. Goulian in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment and in Support of Plaintiffs' Motion to Stay, Exs. 16 & 17 (citing U.S. Department of State: Significant Terrorist Incidents, 1961-2003: A Brief Chronology; New York City Office for Special Planning Public Safety Dep't: Counter-Terrorism Perspectives: The World Trade Center).

The first hijacking of a U.S. aircraft occurred in May 1961, when a Puerto Rican national hijacked a National Airlines plane and flew it to Cuba, to obtain asylum.  In 1973, terrorists attacked an airplane in the Rome airport, killing 29; they then hijacked a different plane and flew it to Greece, where they demanded the release of two Arab terrorists, before ultimately flying into Kuwait and disappearing.  In June 1976, in the Entebbe Hostage Crisis, Palestinian and German terrorists hijacked an Air France Airliner and forced it to land in Uganda.  In June 1985, Lebanese terrorists hijacked a TWA flight and ordered it flown to Beirut, where the passengers were held hostage for 17 days.  Later the same month, a bomb placed on an Air India flight exploded mid-flight, killing all on board; Kashmiri and Sikh groups were blamed.  In March 1986, Palestinian terrorists detonated a bomb on a TWA flight as it approached Athens airport, killing 4 passengers.  In 1988, Libyan terrorists placed a bomb on a Pan Am flight, which detonated over Lockerbie, Scotland, killing everyone on board.  Libyan terrorists committed a similar act in September 1989, causing a UTA flight to explode over the Sahara.  Terrorists also hijacked an Air France flight in December 1994, with no casualties; and a flight bound for Katmandu from New Delhi, also with no casualties.

In July 1972, on "Bloody Friday," the Irish Republican Army detonated car bombs in Belfast, killing 11 and injuring 130.  In October 1983, the Islamic Jihad detonated a

12,000-pound car bomb near a United States Marine Barracks, killing 242 Americans. Simultaneously, the Islamic Jihad detonated a 400-pound bomb on a French compound, killing 58.  In April 1987, a revolutionary organization bombed a bus near Athens, injury 16 American servicemen.  In December of the same year, Catalan separatists bombed a Barcelona bar, killing one American.  In April 1988, the Organization of Jihad Brigades exploded a car bomb outside a USO in Naples, killing one American sailor.  In January 1990, the Tupac Amaru Revolutionary Movement bombed the U.S. Embassy in Peru.  In 1992, Hezbollah bombed the Israeli embassy in Argentina, killing 29 people and wounding 42.  In 1993, Ramsi Yousef parked a van containing a 1,500 bomb in the parking garage of the World Trade Center and detonated it, killing six and injuring 1,000.  In April 1995, American extremists Timothy McVeigh and Terry Nichols destroyed a Federal Building in Oklahoma City with a massive truck bomb, killing 166 and injuring hundreds more.  In August of that year, Hamas detonated a bomb on a bus in Jerusalem, killing six and injuring more than 100.  In January 1996, the Tamil Tigers exploded a bus in downtown Colombo, Sri Lanka, killing 90 and injuring 1,400.  In February 1996, Hamas again blew up a bus in downtown Jerusalem, this time with a suicide bomber, killing 26 and injuring 80.  In June 1996, the IRA detonated a bomb at a Manchester shopping mall, injuring 206 and causing extensive property damage.  In that same month, terrorist groups detonated a fuel truck containing a bomb outside an American military site in Dhahran, killing 19 military personnel and wounding 515.  In December 1996, a bomb exploded in a Paris subway station, killing 4 and injuring 86.  In September 1997, three Hamas suicide bombers detonated bombs in a Jerusalem shopping mall, killing eight and wounding 200.  In August 1998, the IRA detonated a 500-pound car bomb outside a shoe store in Bainbridge, Northern Ireland, killing 35 and injuring 200.  The IRA committed a similar act later that month in Omagh, Northern Ireland,

killing 29 people and injuring 300.  Also in August 1998, the United States embassies in Nairobi and Dar es Salaam were bombed by associates of Osama Bin Laden, killing hundreds, injuring thousands, and causing extensive structural damage.  In October 2000, a small dingy carrying explosives rammed the U.S.S. Cole, anchored in the Port of Aden, killing 17 and injuring 39.  Bin Laden was again suspected.

In 1980, terrorists of the Jewish Defense League bombed the midtown Manhattan offices of the Soviet airline, Aeroflot.  That same year, Armenian nationalists detonated a car bomb outside the Turkish embassy, killing 4.  In 1981, Croatian terrorists detonated a pipe bomb in the subbasement of the New York Supreme Court.  Later that year, pipe bombs were discovered underneath two cars parked near the Soviet mission to the United States; an Israeli nationalist group took credit.  In 1982, Puerto Rican terrorist groups planted a number of bombs at the New York Stock Exchange, at the Bankers Trust building, and at Police Headquarters, breaking windows at the Bankers Trust building and injuring one person at Police Headquarters.

On September 11, 2001, terrorists associated with al Qaeda hijacked American Airlines Flights 11 and 77 and United Airlines Flights 175 and 93, and crashed the fuel-laden Boeing 767 jumbo jets into the Twin Towers of the World Trade Center; into the Pentagon; and, during a struggle with passengers fighting to take back the hijacked United Airlines Flight 93, into a field in Shanksville, Pennsylvania.  The crashes into Towers One and Two gashed massive holes and ignited intense fires that burned until both towers collapsed.  The collapse of the Towers caused the deaths of approximately 2700 people.  In all, approximately 3,000 were killed.  Many more were injured, and continue to suffer injuries, and some died, from the contaminants they breathed and ingested while working at the terrorist sites seeking survivors and cleaning up the debris.

### g.      The Collapse of 7 World Trade Center

1 World Trade Center (the north tower) burned and smoldered for approximately an hour and a half before it collapsed.  Flaming and exploding debris hurtled to the ground, on 6 World Trade Center, the 8-story building just to the north and, further to the north and beyond Vesey Street, breaking windows and penetrating the perimeter of 7 World Trade Center. Pictures of 7 World Trade Center show gashes and debris-related damage on the western and southern façades, between the 6th and 21st floors on the western façade, and between the 5th and 14th floors and the 24th and 47th floors, on the southern façade.  Fires were seen within 7 World Trade Center, and became increasingly visible as the afternoon of September 11 progressed.

7 World Trade Center had been evacuated; there was no one inside.  And the fires within were contained within the structure.  There was no more water pressure: the collapse of the Twin Towers destroyed the water main that brought water to 7 World Trade Center, causing the sprinkler system within to become inoperable.  And the deaths of 343 firefighters and officers in the collapse of the Twin Towers, and the decisions of remaining firefighters to search for their missing comrades rather than fight a fire that posed a threat only to an already-damaged building, allowed 7 World Trade Center to continue to burn, unchecked, for hours until, at 5:21pm, the building collapsed.  7 World Trade Center's collapse fell upon, and crushed, the Con Edison substation and all its power-producing equipment.

### h.      Procedural History of the 7 World Trade Center Litigation

Plaintiffs filed a related case, Civil Action No. 02 Civ. 7188, on September 10, 2002, against the City of New York and the Port Authority.  Con Edison alleged that the City had been negligent because its Office of Emergency Management ("OEM"), which in 1998 had rented space on the 23d floor of 7 World Trade Center, also had designed and installed a diesel-

fueled backup generator for its continuous use, independent of other power sources.  Con Edison

further alleged (i) that the Port Authority was obligated under the Con Edison/Port Authority

lease agreement to provide funds for rebuilding the substation, and (ii) that the Port Authority

had been negligent in allowing for the design and construction of 7 World Trade Center and the

backup generator systems within the building.

      After allowing limited discovery, I granted the City's motion for summary

judgment, holding that the New York Defense Emergency Act, N.Y. Unconsol. Law § 90101 et

seq., as applied to the construction of OEM, gave the City immunity from suit.  In re Sept. 11

Prop. Damage and Business Loss Litig., 468 F. Supp. 2d 508, 518 (S.D.N.Y. 2006).  As to Con

Edison's claims against the Port Authority, I held (i) that Con Edison was entitled under the

insuring provisions its lease agreement with the Port Authority to the replacement value of the

substation, but (ii) that Con Edison could not make out any claims in tort, for any tort claims that

Con Edison sought to assert were merged into the lease agreement.  In re Sept. 11 Litig., 640 F.

Supp. 2d 323, 336, 339 (S.D.N.Y. 2009).

      The Second Circuit Court of Appeals affirmed in part, but reversed the latter

portion of my decision, holding that Con Edison could maintain a negligence claim independent

from its contract with the Port Authority.  Aegis Ins. Servs., Inc. v. Port Auth. of New York and

New Jersey, 09-9063-cv, 2011 WL 2449494 (2d Cir. June 21, 2011) (per curiam).  The Court of

Appeals expressly reserved the issue of duty for later consideration following remand.  Id. at *4

n5.

      After the Port Authority was ordered to the insurance it had collected to Con

Edison, it sought indemnity from Citigroup for the amounts it had to pay Con Edison, arguing

that the various indemnity provisions in the agreements between the Port Authority, 7WTCo.,

and Salomon Brothers provided that Citigroup, as Salomon Brothers' successor, would provide such indemnification.  I held that the relevant agreements did not create such liability for Citigroup.[3]  In re Sept. 11 Litig., 734 F. Supp. 2d 542, 549-50 (S.D.N.Y. 2010).

        The instant lawsuit, Civil Action No. 04 Civ. 7272, was commenced on September 10, 2004, two years after Con Edison's earlier lawsuit against the City and the Port Authority.  Con Edison now sued various private entities: (i) 7WTCo., (ii) Citigroup, (iii) the various contractors who had designed and built 7 World Trade Center; and (iv) the architects, engineers, and design and construction contractors that had designed and installed Citigroup's emergency backup generator.  See Second Am. Compl.  All Defendants moved to dismiss.

        In a lengthy decision, I denied the motions to dismiss by 7WTCo. and Citigroup, holding that they were premature for a decision on the pleadings.  In re Sept. 11 Prop. Damage and Business Loss Litig., 468 F. Supp. 2d at 525-27.  I granted the motions to dismiss by the architects, engineers, and design and construction contractors, holding that they did not owe a duty of care to Con Edison under New York law.  Id. at 533.  Relatedly, I dismissed a third-party action by 7WTCo. against the design and construction contractors who designed and installed the backup generator and fuel systems for Salomon and for the City's Office of Emergency Management.  Aegis Insurance Servs. Inc. v. 7 World Trade Center Company L.P., 04 Civ. 7272 (Doc. No. 264) (S.D.N.Y. March 9, 2007).

---

[3] In a separate lawsuit, Civil Action No. 02 Civ. 7170, 7WTCo.'s insurer, Industrial Risk Insurers, brought a subrogation claim against Citigroup, alleging negligence in its design and installation of the backup generator.  I held that as a subrogee, IRI stood in the shoes of 7WTCo., which expressly assumed the risk associated with any design and installation of the generator.  Industrial Risk Insurers v. Port Authority of New York and New Jersey, 387 F. Supp. 2d 299 (S.D.N.Y. 2005).  The Second Circuit Court of Appeals initially remanded for additional consideration, Industrial Risk Insurers v. Port Authority of New York and New Jersey, 493 F.3d 283 (2d Cir. 2007), but ultimately affirmed, Industrial Risk Insurers v. Port Authority of New York and New Jersey, 296 Fed. Appx. 169 (2d Cir. 2008).

In the years since, 7WTCo. and Citigroup have conducted substantial discovery, which is now all but completed.  7WTCo. and Citigroup have, in light of this discovery, moved for summary judgment dismissing all claims against them.  Con Edison opposes the motion on the ground that genuine issues of material fact remain for trial.  I now consider the motions.

## II.      Standard of Review

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c)(2).  "An issue of fact is genuine if the evidence is such that the jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law."  Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005).  The district court must construe the facts in the light most favorable to the nonmoving party and resolve all ambiguities and draw all reasonable inferences against the movant.  Pucino v. Verizon Wireless Comms Inc., 618 F.3d 112, 117 (2d Cir. 2010).  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 317 (1986).  If the moving party makes the showing, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).  The district court has the same discretion to admit and consider expert reports and testimony at summary judgment as at trial.  Major League Base, ball Props. v Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).  The mere fact that a party has produced an expert opinion does not preclude granting summary judgment in favor of the other party.  Raskin v. Wyatt Co., 125 F.3d 55, 66-67 (2d Cir. 1997).

### III.    Discussion

### a.   The Claims of Negligence *Per Se*

As a threshold point, I may easily dispose of Counts 2 and 4, alleging claims of negligence *per se* against 7WTCo. and Citigroup.  Under New York law, claims of negligence *per se* are available where the defendant's alleged negligence involves violation of a statute. Elliott v. City of New York, 95 N.Y.2d 730, 734 (N.Y. 2001).  For this reason, I previously held that Con Edison's claims of negligence *per se* against other Defendants in this case could not survive, for Con Edison could not show that a statute had been violated.  In re Sept. 11 Property Damage and Business Loss Litig., 468 F. Supp. 2d at 528, 535.  For the same reasons, since Con Edison has not shown that 7WTCo. or Citigroup violated a statute, and Con Edison's claims of negligence *per se* are dismissed.

### b.  The Claims of Negligence

### 1.  Con Edison's Theories of how 7 World Trade Center Collapsed

Before I discuss the issue of duty, and in order to present a complete picture of the proofs presented to me, I discuss in this section Con Edison's theories as to the cause of the collapse of 7 World Trade Center.  Based on the discovery and the proofs of its experts, Con Edison presents two theories of design defect causing 7 World Trade Center to collapse: weakness of structural supports at the northeast corner of the building, and an excessive buildup of heat from the diesel fuel in the emergency backup generator systems and tanks within the building.  The transcript of argument has a lengthy exposition of the theories and proofs.

As Con Edison explained during oral argument, "the fires first started to burn as a result of debris getting into World Trade Center 7 from . . . 1 [World Trade Center].  That debris got into the southwest corner of the building."  Transcript of Oral Argument at 48, Aegis Ins.

<u>Servs. V. 7 World Trade Co.</u>, 04 Civ. 7272 (S.D.N.Y. Dec. 16, 2010).  Further, according to Con

Edison, the collapse of 7 World Trade Center was "highlighted" by "two distinctive events,"

both in the northeastern portion of the building (top right corner of the diagram).  Supplemental

and Amended Declaration of Jose L. Torero ("Torero Amended Decl."), Ex. B.  The first event

was "the fall of the East Penthouse into the building."  <u>Id.</u>  The second event, gleaned from the

pattern of the building's collapse, was "the appearance of a visual pattern running in the north-

south direction to the east of the centre of the building," at the point where exterior column 44

connected to interior column 79, described during argument as "the kink" that formed.  <u>Id.</u>; <u>see</u>

<u>also</u> Transcript of Oral Argument at 53.  The floor plan is reproduced here again to pictorialize

Con Edison's first theory.

**North**



Based on structural drawings (Cantor 1985)

**South**

Con Edison theorizes as follows.  "[S]tandard office fires" began in the southwest

corner of 7 World Trade Center (bottom left corner of the diagram), the nearest point to 1 World

Trade Center, the consequence of debris falling from it.  See Supplemental and Amended Second

Declaration of Colin G. Bailey ("Bailey Amended Decl."), Ex. D.  Because 7 World Trade

Center's structural elements were improperly fireproofed, these fires were able to burn too hot,

for too long, as they passed around the building.  See Supplemental and Amended Second

Declaration of Frederick W. Mowrer ("Mowrer Amended Decl."), Ex. D; see also Transcript of

Oral Argument at 62-63.  This excess heat allowed the steel beams connecting the interior and

exterior columns to become too hot and to expand.  In the northeast corner of the building, where

column 79 and column 44 were connected at an oblique angle, and without a connection between

column 79 and a column on the eastern perimeter, beams on several floors broke off from the

columns and fell.  See Colaco Amended Decl., Ex. B; Bailey Amended Decl., Ex. D; see also

Transcript of Oral Arg. at 57-58.  When the support beams steadying column 79 fell away,

column 79 became wobbly and fell, causing a "cascade" like effect of falling interior columns

that caused the building to collapse in a cascading spiral.  See Transcript of Oral Argument at 60.

The second theory of 7 World Trade Center's collapse considers the diesel-fuel

powered emergency backup generators.  Con Edison contends that the fuel in the two 6,000-

gallon tanks supporting Citigroup's backup generator was not found in the soil beneath the

rubble of 7 World Trade Center, and were not found elsewhere, from which Con Edison infers

that the fuel burned that day and was consumed.  See Torero Amended Decl., Ex. B; see also

Transcript of Oral Argument at 75.  Con Edison contends further that black smoke could be seen

from the building while it burned.  From this, Con Edison theorizes that diesel fuel from

Citigroup's generator poured into the 6th floor, where it caught fire and burned, heating the

transfer trusses that bore the load of the top 40 stories of the building.  The trusses expanded,

causing failures that caused the building to collapse centripetally—in towards its center.  See Transcript of Oral Argument at 75.

Defendants dispute the facts and the theories.  Furthermore, Con Edison's two theories are contradictory in their explanation as to how 7 World Trade Center collapsed, for the first theory suggests a spiraling collapse starting from the building's northeastern corner, and the second theory suggests a centripetal collapse.  However, the absence of duty, explained below, makes it unnecessary to explore further, at trial, these complicated and confusing speculations as to how 7 World Trade Center collapsed and what significance the collapse offers on issues of negligence in the building's design or construction.

**2.  No Duty Exists Under the Circumstances Presented on September 11**

As a threshold matter, there is no question that Con Edison may generally claim a duty from 7WTCo., and perhaps from Citigroup, not to expose it to unreasonable risk because of negligent building design, construction, or maintenance.  Landlords have a duty to provide reasonable safety features for tenants and business invitees.  Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 232 (N.Y. 2001); Kush v. City of Buffalo, 59 N.Y.2d 26, 29 (N.Y. 1983).  This is because a landlord, like entities found to possess special relationships giving rise to legal duties in tort, is in the "best position to protect against the risk of harm."  Id.  7WTCo. was not Con Edison's landlord, for Con Edison had leased its space beneath 7 World Trade Center from the Port Authority, not from 7WTCo.  But, "[a]lthough the duty owed by owners or occupiers of land of land is generally thought to extend to tenants (or subtenants), patrons or invitees, it is clear that [a] landowner who engages in activities that may cause injury to persons on adjoining premises surely owes those persons a duty to take reasonable precautions to avoid injuring

them."  In re Sept. 11 Prop. Damage & Business Loss Litig., 468 F. Supp. 2d at 524 (internal

quotation omitted).

　　　　The issue before me, however, is not so much whether a general duty exists, but

whether that duty should encompass the long chain of events on September 11, 2001, that

eventuated in the destruction of the Con Edison substation.

　　　　In Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 343 (N.Y. 1928), a man was

attempting to catch a train while carrying a package of fireworks; he was pushed on to his train

by train guards, allegedly negligently, causing him to drop his package, which detonated when it

hit the ground.  Id. at 340-41.  The blast of the fireworks knocked over a set of scales at the other

end of the platform, injuring the plaintiff, who was waiting for another train.  Id. at 340.  The

New York Court of Appeals, in an opinion by Judge Cardozo, ordered the plaintiff's case

dismissed.  The Court of Appeals ruled that the negligence, if any, did not proceed from a duty

owed to the plaintiff, for the train guards could not reasonably foresee that their actions would

cause an injury to the plaintiff.  Id. at 341.  As the Court stated,

> "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk
> imports relation; it is risk to another or to others within the range of
> apprehension."

Id. at 344.  The famous ruling is a valid today as it was in 1928.  It was not within 7WTCo.'s, or

Citigroup's, "range of apprehension" that terrorists would slip through airport security, hijack an

airplane, crash it suicidally into the one of the two tallest skyscrapers in New York City, set off

falling debris that would ignite a building several hundred feet away, cause structural damage to

it, destroy water mains causing an internal sprinkler system to become inoperable, kill 343

firemen, and paralyze the rest so that a fire within a building would not be put out and the

building would be allowed to burn an entire day before it consumed itself and collapsed.[4]

"The risk reasonably to be perceived" by 7WTCo. and Citigroup, and their "duty

to be obeyed," id., did not encompass the strange, improbable, and attenuated chain of events

that led to 7 World Trade Center's collapse and the crushing of Con Edison's substation.

Nothing in common experience or history could give rise to a reasonably foreseeable risk

relating to the chain of events flowing from the terrorists and their hijackings to the destruction

of the Con Edison substation.  New York imposes on courts the duty to "limit the consequences

of wrongs to a controllable degree and to protect against crushing exposure to liability."  Strauss

v. Belle Realty Co., 65 N.Y.2d 399, 402 (N.Y. 1985).  To permit a duty to exist under the present

circumstances would subject the developer of 7 World Trade Center, and a tenant, to

uncontrolled and unforeseeable liability.  The risks being litigated were not within the zone of

reasonable foreseeability, and so extending duty here would create impermissibly broad liability,

Lauer v. City of New York, 95 N.Y.2d 95, 100 (2009), and would offend New York policy,

Palka v. Servicemaster Mgmt. Servs. Corp., 83 N.Y. 579, 586 (N.Y. 1994).

Additionally, the acts of the September 11 terrorists  that gave rise to the chain of

events leading to the destruction of Con Edison's substation were criminal acts unprecedented in

their scope and effect.  Thus, in Maheshwari v. City of New York, 2 N.Y.3d 288 (N.Y. 2004),

the Court of Appeals held that a landlord, or controller of premises, had no duty to protect

invitees from unprecedented criminal acts of others.  There, the plaintiff, a Krishna, attended the

---

[4] In In re Sept. 11 Litigation, 280 F. Supp. 2d 279 (S.D.N.Y. 2003), I held that the Aviation Defendants sued in this litigation had a duty to victims on the ground at the World Trade Center site on September 11, 2001.  Id. at 292-93. I so held in light of the policy considerations set forth by the New York Court of Appeals in 532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc., 96 N.Y.2d 280 (N.Y. 2001), and the fact that the Aviation Defendants were in a position to control the actions of the terrorists.  In re Sept. 11 Litig., 280 F. Supp. 2d at 290.  7WTCo. and Citigroup are situated differently from the Aviation Defendants, and given the long chain of events in this case that caused the destruction of the Con Edison substation, nothing in my previous decision supports finding a duty here.

concert held on land owned by the City for the purpose of handing out flyers about Krishna

Consciousness, and was randomly assaulted by four concertgoers.  The plaintiff sued, alleging

that the defendants had been negligent for failing to provide a reasonable level of security.  The

Court of Appeals held as a matter of law that the scope of the defendants' duty did not extend to

the violent act committed against the plaintiff.  Id. at 294.  The Court of Appeals noted that past

crimes committed at the concert were "of a lesser degree than criminal assault, and would not

lead defendants to predict that such an attack would occur or could be prevented."[5]  Id. at 294.

        Con Edison argues that had 7 World Trade Center not been built in violation of

various industry norms and building codes, such as those of the ANSI, it would not have

collapsed, even from the damage it suffered on September 11.  But failure to comply with

statutory or regulatory enactments is, at best, evidence of negligence; it does not define duty.

See Kelly v. Metropolitan Ins. and Annuity Co., 918 N.Y.S.2d 50, 54 (1st Dept. 2011); see also

Babich v. R.G.T. Restaurant Corp., 906 N.Y.S.2d 528, 529 (1st Dept. 2010); Lopez v. Fordham

Univ., 894 N.Y.S.2d 389, 391 (1st Dept. 2010).  As the New York Court of Appeals explained,

compliance, or lack thereof, is some evidence of negligence—negligence not in the abstract, but

in derogation of a defined duty.  Elliott, 95 N.Y.2d at 736.  Perhaps, as Con Edison argues, 7

World Trade Center might have remained standing had it been built differently, but this does not

mean that a duty was breached.  As the preceding section makes clear, 7WTCo. and Citigroup

could not have reasonably perceived the chain of events that led to the destruction of the Con

Edison substation, Hamilton, 96 N.Y.2d at 232; see also Palsgraf, 248 N.Y at 344, and had no

duty to Con Edison capable of giving rise to a finding of liability.

---

[5] For this exact same reason, the Court of Appeals held that no causation could be made out, for the unprecedented criminal acts were sufficient intervening cause to sever the chain of causation.  Maheshwari, 2 N.Y.3d at 295-96.

## IV.    Conclusion

For the foregoing reasons, summary judgment is granted to 7WTCo. and Citigroup dismissing all remaining claims against them.  As this decision resolves the last claims in Civil Action No. 04 Civ. 7272, the Second Amended Complaint is dismissed.  The Clerk of Court shall terminate the motions (Doc. Nos. 388 and 392), and shall also terminate Con Edison's outstanding motion to stay (Doc. No. 400).  The Clerk shall enter judgment for Defendants and close the case.

SO ORDERED.

Dated:      September 23, 2011
            New York, New York

ALVIN K. HELLERSTEIN
United States District Judge